IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JAMES MACK                                                                                           PLAINTIFF

v.                                Civil No. 4:10-cv-04129

SGT. JOHNNY WELSH;
CPL. TRACEY SMITH; and
OFFICER RACHEL JONES                                                                         DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by Plaintiff, James Mack, pursuant to the provisions of 42 U.S.C. § 1983.  Plaintiff proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of 28 U. S. C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.  An evidentiary hearing was held on October 4, 2012.  The case is now ready for decision.

Plaintiff is currently incarcerated in Arkansas Department of Corrections East Arkansas Regional Unit in Brickeys, Arkansas.  The events at issue in this case occurred while Plaintiff was incarcerated in the Miller County Detention Center ("MCDC").  Specifically, Plaintiff maintains that he was subjected to excessive force when Defendants tased him on June 15, 2010.[1]

---

[1] In his Complaint, Plaintiff also claims he was denied medical care on June 15, 2010 and named Sheriff Ron Stovall as a Defendant.  ECF No. 1.  This claim and Sheriff Stovall were dismissed at the summary judgment stage.  ECF No. 33.  Additionally, Plaintiff filed a Motion to Amend his Complaint, on November 1, 2010, in order to add a retaliation claim.  ECF No. 14. The Court granted Plaintiff's Motion and directed him to file an Amended Complaint by January 28, 2011.  ECF No. 17.  On December 28, 2010, the Clerk of the Court sent Plaintiff a blank

1

I.      **BACKGROUND AND EVIDENCE**

At the evidentiary hearing, the testimony of the following witnesses was heard: (1) Steve Hartline; (2) Plaintiff James Mack; (3) Draylon Williams; (4) James Neal; (5) Defendant Tracey Smith; (6) Defendant Rachel Jones; and (7) Defendant Johnny Welch.  For purposes of discussion, the testimony of the witnesses will be briefly summarized.

**Captain Steve Hartline**

Plaintiff requested Defendants produce the MCDC video footage from June 15, 2010 at the evidentiary hearing.  Defendants represented that such footage did not exist and presented Steve Hartline to testify as to this matter.  Hartline is currently the Captain at MCDC and has been responsible for supervising the MCDC staff since November 20, 2009.  Hartline testified there is no video footage of the June 15, 2010 incident.  This incident occurred in the West Bravo Pod ("B Pod").  At the time of the incident there were cameras in some west pods, however, Hartline is not aware of any video footage that existed from the B Pod on June 15, 2010.  An additional issue with the video system at the time of the incident was the inability to record footage.  Footage could be reviewed for up to twenty-one (21) days but it could not be recorded.  The failure to record video footage was not the policy of the MCDC at that time—the facility simply lacked the capabilities to convert the footage to a device for recording.

**Plaintiff James Mack**

Plaintiff was incarcerated at the MCDC on June 15, 2010.  On June 15, 2010, Plaintiff

---

Section 1983 from to use in filing his Amended Complaint.  Plaintiff never filed an Amended Complaint.  Therefore, he never appropriately asserted a retaliation claim and no such claim was considered.

came out of the restroom wearing his black do-rag,[2] no shirt, and holding a cup. Smith came to Plaintiff and asked for his do-rag. Plaintiff asked why he could not keep his do-rag since there was no policy banning do-rags. Smith explained it was a new policy and only white do-rags were currently allowed in the MCDC. Smith then tried to grab the do-rag from Plaintiff's head. Plaintiff told Smith "don't put your hands on me." Contrary to his earlier testimony, Plaintiff later testified that Smith never asked for the do-rag. Additionally, Plaintiff testified that Welch never gave him a direct order to turn over the do-rag, instead Welch only said to Plaintiff: "take off the do-rag and give it to me." Plaintiff did not give Welch or Smith the do-rag.

Plaintiff attempted to compromise with Welch and asked to see the new policy, but Welch slapped Plaintiff's cup from his hand and grabbed Plaintiff's arm. Smith helped Welch by grabbing Plaintiff's other arm. Plaintiff believed Welch and Smith grabbed him because they were trying to "rough him up" and take his do-rag. Plaintiff also testified that he believed they were trying to put him in restraints. Welch and Smith pulled Plaintiff to the B-Pod door and Welch then ordered Jones to tase Plaintiff. An unnamed officer then came into B Pod, and told Welch, Smith, and Jones they "messed up enough" and to get off Plaintiff. Plaintiff was then walked out of the pod and to R&D without ever being handcuffed. At R&D, Jones cleaned Plaintiff's taser prong wounds and Plaintiff informed Jones that his back hurt. Jones stated there was nothing she could do about Plaintiff's back and then escorted him to Max E. Plaintiff was never handcuffed.

Plaintiff testified that he never resisted, however, he also testified that he did not allow Welch and Smith to place him in handcuffs, refused to remove the do-rag, and estimated that

---

[2] A do-rag is a scarf or cloth worn, primarily by African-American men, on the head to protect a hairstyle. Oxford English Dictionary, http://www.oed.com (last visited October 22, 2012). The do-rag is also referred to as a wave-cap in the record.

3

approximately five to ten minutes elapsed from the time Welch first grabbed his arm and the time Jones tased him. Plaintiff also estimated there were approximately thirty-three (33) inmates in B Pod with him at the time of the incident. Plaintiff denied that he shouted out to the other inmates for help, but stated the other inmates were talking and saying things like "that's messed up" during the incident. Neither Welch nor Smith struck Plaintiff during the incident.

Plaintiff testified that his injuries include swollen spots on his back where the taser hit him and back pain. Plaintiff was prescribed muscle relaxers and Ibuprofen that he took until December 2010. The muscle relaxers were prescribed in July 2010.

**Draylon Williams**

Williams is currently incarcerated in ADC Texarkana Regional Correction Center but was incarcerated at the MCDC, in the B Pod, on June 15, 2010. Williams testified that he witnessed the incident between Plaintiff and the Defendants on June 15, 2010. According to Williams, Plaintiff was wearing a black do-rag and Smith asked Plaintiff to remove the do-rag. Welch then came to the pod and Plaintiff asked him for the policy on wearing black do-rags. Welch attempted to grab the do-rag from Plaintiff's head but was not able to do so. Welch also attempted to grab Plaintiff and handcuff him. While Welch was attempting to handcuff Plaintiff, Plaintiff was questioning Welch. At this same time, Smith grabbed Plaintiff's other arm and attempted to handcuff Plaintiff. Jones tased Plaintiff while Welch and Smith had a hold on his arms attempting to handcuff him. Williams did not witness Welch, Smith, or Jones strike Plaintiff, and all parties remained on their feet until Plaintiff was tased and fell to the floor.

**James Neal**

Neal was also incarcerated at the MCDC, in B Pod, on June 15, 2010 and witnessed the

incident between Plaintiff and Defendants. According to Neal, Smith asked Plaintiff for his do-rag first. There was no physical contact between Smith and Plaintiff during this interaction. Smith then attempted to take Plaintiff's do-rag at the same time he told Plaintiff black do-rags were not allowed at the MCDC. Plaintiff told Smith "man you don't have to put your hands on me." Plaintiff then went to speak with Welch about the do-rag policy. Then, Welch and Smith each grabbed one of Plaintiff's arms and attempted to take him out of the pod. Jones was standing in the doorway of the pod. The pod door was closed. Neal first testified that Welch ordered Jones to tase Plaintiff when they got him approximately one to two feet from the door. Neal later testified he heard the order to tase Plaintiff but was unsure who issued it. Plaintiff was not handcuffed at the time Jones tased him. After Jones tased Plaintiff, the Defendants removed the taser prongs from Plaintiff, handcuffed him, and took him to the holding cell. Plaintiff never took the do-rag off his head or attempted to give it to either Smith or Welch. Neal testified he never saw Plaintiff resisting prior to being tased.

**Defendant Tracey Smith**

Tracey Smith was employed with MCDC on June 15, 2010 as a Corporal. Smith testified that, pursuant to the warden's order, only white do-rags were allowed in the MDCD at this time. Smith testified Plaintiff was wearing a black do-rag on June 15, 2010. Smith asked Plaintiff to turn over the do-rag but Plaintiff refused. In the Major Disciplinary Report Smith filed regarding this incident, he stated Plaintiff refused to turn over the "wave cap" and quoted Plaintiff as stating: "I aint goin for this shit, I aint takin it off, this is some bullshit. We aint got to go for this shit. Come on yall (speaking at this time to the other inmates in the pod), we aint got to take this shit." *See Plaintiff's Ex.* 5. Smith then called Welch to help him. Welch requested that Plaintiff turn

5

over the do-rag but Plaintiff again refused.

Smith and Welch then attempted to remove the do-rag from Plaintiff's head at which time Plaintiff resisted. Welch and Smith then attempted to handcuff Plaintiff but he continued to resist by stiffening his arms, twisting, turning, and jerking around. Finally, Jones tased Plaintiff and Smith and Welch handcuffed him. No party was on the floor during the struggle. The taser prongs were removed within a matter of seconds. Jones then took Plaintiff to R&D and applied alcohol to the prong marks. Smith testified he only felt at risk when Plaintiff called for help from the other inmates in the pod. Smith was unsure if Plaintiff attempted to hit him.

**Defendant Rachel Jones**

Rachel Jones was employed with MCDC on June 15, 2010 as an officer. Jones testified that on June 15, 2010, she was standing in the doorway of B Pod watching the incident with Plaintiff, Smith, and Welch transpire. From Jones's viewpoint, it appeared that Plaintiff took a swing at Welch while he was resisting being handcuffed. Jones stated in her affidavit that it appeared to her that Plaintiff took a swing at Welch. *See Plaintiff's Ex.* 2. Jones observed that Welch and Smith could not get Plaintiff to comply with being handcuffed. Plaintiff continued to pull away from Smith and Welch as they tried to take his do-rag. Welch ordered Jones to tase Plaintiff and she did. Plaintiff was approximately ten feet away when she tased him. Jones did not use her pepper spray because she did not want it to impact the officers or other inmates in the pod. Plaintiff did not suffer any injuries other than the two marks on his back from the taser prongs. Jones could not hear any instructions given by Smith or Welch because her location in the doorway was to far away from the altercation. However, from what Jones observed, it was obvious to her that Plaintiff was resisting being handcuffed. Jones swabbed the prong marks on

Plaintiff's back with alcohol after he was tased.

**Defendant Johnny Welch**

Johnny Welch was employed with MCDC on June 15, 2010 as a Sergeant. Welch testified that Smith came to him and told him Plaintiff was wearing a black do-rag. Welch instructed Smith to go back B Pod and take the black do-rag from Plaintiff. Only white do-rags were allowed at the MCDC at this time. Smith returned and informed Welch that Plaintiff refused to turn over the do-rag, was using abusive language, and the pod was getting "riled up." There were thirty-two (32) to thirty-four (34) inmates in B Pod with Plaintiff at the time of the incident. Welch then returned to the pod with Smith and together they requested Plaintiff give them the do-rag. Plaintiff again refused. Welch and Smith then attempted to take the do-rag from Plaintiff, and Plaintiff began to struggle with Welch and Smith. According to Welch, Plaintiff went "ballistic" when Welch attempted to take the do-rag off his head. Plaintiff began yelling "y'all come on," and the three traveled across the length of the pod while Plaintiff was twisting and struggling to resist being handcuffed. Welch and Smith would grab Plaintiff but he would get away and they were unable to maintain a hold on him. Welch then ordered Jones to tase Plaintiff. Welch testified that after the tasing, Plaintiff stretched his arms up and said "y'all can cuff me now." Welch also testified that he was unsure if Plaintiff ever intentionally attempted to hit him during the altercation, but Plaintiff was flailing around and was told to stop resisting several times. Welch denied that Plaintiff pulled him aside in an attempt to compromise about the do-rag.

**II.    DISCUSSION**

The record does not indicate whether Plaintiff was a pretrial detainee or a convicted prisoner at the time of the alleged use of excessive force. In view of this, I will apply the objective

reasonableness standard applicable to pretrial detainees under the Fourteenth Amendment. *See Johnson-El v. Schoemehl,* 878 F.2d 1043, 1048 (8th Cir. 1989). The Eighth Circuit Court of Appeals noted:

> [u]nlike convicted prisoners, the state has no right to punish [pretrial detainees]. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency. Constitutionally infirm practices are those that are punitive in intent, those that are not rationally related to a legitimate purpose or those that are rationally related but are excessive in light of their purpose. *Id*. at 538, n. 20.

*Johnson-El v. Schoemehl*, 878 F.2d at 1048.

The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rely on the same objective reasonableness standard as arrestee claims grounded in the Fourth Amendment. *Andrews v. Neer,* 253 F.3d 1052, 1060 (8th Cir. 2001) (citing *Schoemehl,* 878 F.2d at 1048-9). The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals. *See Schoemehl,* 878 F.2d at 1048. The relevant inquiry being whether the officials acted in an objectively reasonable manner in light of the facts and circumstances confronting them without regard to their underlying intent or motivation. *See Graham v. Connor*, 490 U.S. 386, 397 (1989). The Court should consider the reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Finally, the Court should consider, from the perspective of a reasonable officer at the scene, whether the totality of the circumstances justifies the use of force. *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1081 (8th Cir. 1990).

In this case, Plaintiff claims he was subjected to excessive force by Smith, Welch, and Jones when he was tased on June 15, 2010. Even though Plaintiff claims he was never given a an order to turn over his black do-rag and that he never resisted Welch and Smith, he testified to the contrary at the evidentiary hearing. Plaintiff testified that Welch said to him "take off the do-rag and give it to me." He also testified he refused to remove the do-rag, instead seeking some sort of "compromise" with the officers. Plaintiff testified he believed Welch and Smith were trying to put him in restraints, and that approximately five to ten minutes elapsed from the time Welch first grabbed him and Jones tased him.

Smith and Welch both testified they requested, then demanded, Plaintiff remove the do-rag. Both also testified Plaintiff refused to do so and resisted their efforts to restrain him. Both of Plaintiff's witnesses, Draylon Williams and James Neal, testified Plaintiff disregarded the officer's request or order to remove the do-rag. Jones testified Plaintiff was plainly resisting restraint and appeared to attempt to strike Welch during the altercation. Welch and Smith also testified Plaintiff attempted to incite other inmates to assist him.

Accordingly, I find credible the testimony of all of the witnesses that Smith and Welch asked or directed Plaintiff to turn over his black do-rag but he refused to do so. Plaintiff then persisted in resisting the attempts to restrain him.

This testimony shows Plaintiff failed to follow an order to turn over the banned do-rag and resisted being handcuffed for at least five minutes prior to being tased. Jail officials are justified in using force to enforce the jails rules and regulations. *Daniels v. Reams,* (W.D. Ark. July 17, 2008) (the defiance of commands to follow institutional security rules—to tuck in shirt and walk with hands behind back— justified use of force). The Seventh Circuit artfully articulates the

9

importance of prisoners following orders:

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them.... Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey,* 581 F.3d 467, 476-7 (7th Cir. 2009), *cert. denied,* 130 S.Ct. 1936 (2010), quoting *Soto v. Dickey,* 744 F.2d 1260, 1267 (7th Cir. 1984), *cert. denied,* 470 U.S. 1085 (1985). In *Hickey,* the Eighth Circuit recognizes that officials "may compel compliance with legitimate prison regulations" with physical force. *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993).

However, even though Defendants are justified in using force to enforce the MCDC's rules and regulations, I believe the testimony indicates that Plaintiff was tased for resisting restraints and posing a security threat in B Pod. According to the testimony, the altercation took place in an open pod with approximately thirty-three (33) other inmates present. Smith and Welch both testified that Plaintiff was actively inciting the other inmates in B Pod to join in his resistance against the officers. Welch testified that Plaintiff was using abusive language and the other inmates in the pod were getting "riled up." Smith also noted the exact language Plaintiff used in the Major Disciplinary Report which included: "Come on yall . . . we aint got to take this shit." Smith testified that the only time he felt at risk was when Plaintiff was calling for help from the other inmates in the pod. Plaintiff denied that he was yelling and attempting to get the other inmates in the pod involved in the altercation, but admitted that other inmates where talking about the incident as it transpired and saying things like "that ain't right." Even crediting Plaintiff's testimony—that he did not actively incite the other inmates to get involved in the altercation—Plaintiff's own testimony evidences the fact the inmates in the B Pod were agitated

10

and commenting on the altercation as it occurred. Additionally, Defendants attempted to restrain Plaintiff for five to ten minutes, while he resisted being handcuffed, before tasing him. Finally, Williams testified that Plaintiff was not handcuffed when tased, and Jones testified she believed she saw Plaintiff take a swing a Welch before he ordered her to tase Plaintiff.

"Maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U..S. 520, 546 (1979). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 544. This deference is not only afforded to situations responding to actual confrontations with riotous inmates but also applies to "prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

I find the testimony shows Defendants were objectively reasonable in believing force was necessary in light of the facts and circumstances confronting them in the B Pod on June 15, 2010. I now turn to whether the particular force used, a taser, was in excess of that reasonably believed necessary to achieve the goals of restraining Plaintiff and maintaining security to B Pod. *See Schoemehl,* 878 F.2d at 1048.

In the Eighth Amendment context, a convicted inmate has a right to be free from a taser shock or its equivalent in the absence of a security threat. *See Hickey,* 12 F.3d at 759 (use of a taser to ensure compliance with housekeeping regulations is not constitutionally permissible). Similarly, an arrestee, under the Fourth Amendment, is also entitled to be free from taser shock

11

in the absence of a security threat. *See Brown v. City of Golden Valley,* 574 F.3d 491, 500 (8th Cir. 2009) (citing *Hickey,* 12 F.3d at 759). However, use of a taser is not *per se* excessive and is justifiable when the circumstances warrant such force. *See e.g.,. Carpenter v. Gage,* 686 F.3d 644, 549-50 (8th Cir. 2012) (officers could reasonably interpret arestee's refusal to offer hands for handcuffs and attempts to rise from the floor as resistance and thus, tasing the arestee was reasonable); *Forrest v. Prine,* 620 F.3d 739, 747 (7th Cir. 2010) (tasing of a pretrial detainee in holding cell for refusing to remove underwear and comply with a strip search was found to be a reasonable, good faith effort to maintain or restore discipline within the jail); *Jasper v. Thalacker,* 999 F.2d 353 (8th Cir. 1993) (The Eighth Circuit has held that the use of a stun gun to subdue a prisoner who had verbally threatened and then lunged at a prison official did not constitute the use of excessive force).

Here, Plaintiff defied a direct order, resisted restraints for at least five minutes, possibly for as long as ten minutes, and posed a security risk in an open pod with approximately thrity-three (33) other inmates. Therefore, I find Defendants' actions were objectively reasonable under the circumstances, and the force used was justified.

### III.    CONCLUSION

Accordingly, I recommend that judgment be entered in Defendants' favor and the Complaint (ECF No. 1) be dismissed with prejudice.

**The parties have fourteen days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the**

**district court.**

        **DATED** this **25th day of October 2012.**

                                              /s/ Barry A. Bryant
                                              HON. BARRY A. BRYANT
                                              UNITED STATES MAGISTRATE JUDGE